UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NICHOLAS PAUL JAHANIAN, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 4:13-CV-103 |
| | § | |
| WILLIAM STEPHENS, | § | |
| | § | |
| Respondent. | § | |

**MEMORANDUM AND ORDER**

This case is before the Court on Petitioner Nicholas P. Jahanian's Petition for Writ of Habeas

Corpus.   Having carefully considered the Petition, the Respondent's Answer, the Petitioner's

Rebuttal, and the arguments and authorities submitted by the parties, the Court is of the opinion that

Jahanian's Petition for Writ of Habeas Corpus should be DENIED.

I.      Background

Jahanian was convicted in the 183rd District Court of Harris County, Texas of engaging in

organized criminal activity and was sentenced to 50 years imprisonment.  Texas' Fourteenth Court of

Appeals described the complex conspiracy Jahanian and others engaged in to steal and resell goods.

> The evidence showed that from January 2004 through February 2006,
> Nicholas and other members of the Jahanian family, including his
> parents, Bahram "B.J." Jahanian and Cindy Jahanian, and his sister
> Krystal Jahanian, participated in a theft scheme to unlawfully obtain
> merchandise from stores throughout Texas and to sell the
> merchandise for profit though Nicholas's eBay account named
> "Bwatchers." Others also participated in the scheme, including three
> accomplices who testified during the trial, Valerie Baker, Elizabeth
> Espirit, and Richard Schroeder. The stores targeted in the scheme
> included Target, Wal-Mart, Home Depot, and Lowe's.
> Representatives of these stores were named as the owners of the
> property in the indictment against Cindy.
>
> * * *
>
> The scheme operated as follows. Cindy, Krystal, and an accomplice,
> usually Elizabeth Espirit but sometimes Richard Schroeder, would
> drive to one of the stores somewhere in Texas, and Cindy and Krystal

would enter the store with labels showing UPC codes for low-end or low-priced merchandise that they or someone else in the theft ring had purchased or stolen for the purpose of getting the bar codes. Once inside the store, Cindy and Krystal located usually at least two high-end items such as MP3 players, faucets, cameras, phones, DVD recorders, or printers.FN3 While one acted as lookout, the other placed the bar-code labels for the lower-priced merchandise over the bar code shown on the high-end items so that the desired merchandise could be purchased for a substantially lower price.

FN3. The indictment against Nicholas, as amended, alleged the following types of merchandise: shavers, MP3 players, faucets, music stations, speakers, printers, camcorders, thermostats, cameras, printer docks, print servers, software, phones, DVD-VHS recorders, DVD recorders, paintball markers with masks and tanks, toothbrushes, paintball guns, tennis racquets, gift cards, water filters, and print cartridges. ...

Once the bar codes were switched, Cindy or Krystal placed a cell-phone call to the accomplice, who separately entered the store, and gave the accomplice a description of the desired merchandise and its location. Cindy and Krystal then left the store, and the accomplice . . . would locate the merchandise and attempt to check out with it. When possible, the accomplice would take the merchandise to a check-out counter occupied by a young, seemingly inexperienced clerk. When the merchandise rang up at the lower price shown by the switched bar code, the accomplice paid for it and the personal item, left the store, and returned to the car. The three would then either go to another store or quit for the day. Cindy and Krystal would then store the stolen merchandise either at their home or a storage unit they maintained.

To dispose of the merchandise, Nicholas Jahanian sold the items on eBay using his eBay account, known as "Bwatchers," and sent the merchandise to whomever had purchased it.FN4 Nicholas then distributed the profits among himself and the other members of the ring, including Cindy and Krystal. The eBay business prospered and supported Nicholas, Cindy, and Krystal.

FN4. The address for the Bwatchers account was Cindy Jahanian's home on Spanish Needle.

Doug Osterberg, an investigator in the Harris County District Attorney's Office Special Crimes Division, testified extensively about his involvement in the investigation of the theft ring and its operation. He also provided testimony about the value of the stolen property. Among other things, Osterberg testified that records obtained from eBay showed that the types of items being sold through the Bwatchers account were MP3 players, faucets, electric razors, cordless phones,

print servers, and cameras, most of which were listed as "new in box." For the period that eBay records were available, October 2004 to the end of October 2005, Bwatchers sold 2,109 items for a total of about $258,000. At this point, Osterberg decided to contact the loss-prevention departments of several of the stores for assistance. Store personnel and additional officers conducted surveillance on the ring, and the jury was shown security-camera videos of the ring's operation.

On cross-examination, Osterberg explained that he went over the records of the Bwatchers account with loss-prevention personnel, and although they were able to show that there were losses in the areas of those types of products, they could not say that specific items on the list actually came from their stores. Osterberg agreed that the only items actually traced back to specific stores were those that the ring was observed stealing during surveillance. He also agreed that the eBay list did not show how much the Jahanians might have paid to acquire the items originally; it showed only the price that eBay customers paid Bwatchers for the items. He also admitted that some of the merchandise came from other stores not included in the case.

Osterberg further testified that his office calculated the amount of the stores' losses primarily by using the eBay records. When asked if he knew what the ring actually paid for the items, he explained that the sales price was usually either about $27 or $7, depending on which of two fake bar codes they decided to use. The bar codes were copied from Lexmark ink printer cartridges and water filters the ring purchased. Osterberg stated that his testimony was based on information from other participants in the ring and evidence seized from Cindy's and Nicholas's homes and a storage unit Cindy controlled.

Larry Boucher, another investigator with the Harris County District Attorney's Office, testified concerning his participation in the surveillance of Cindy, Krystal Jahanian, and Elizabeth Espirit on January 26, 2006. The surveillance captured both successful and unsuccessful attempts to carry out the theft ring's operation. On that day, Boucher observed the group first going to a Target in Harris County, where their activities were captured on video. Boucher testified that the video showed Cindy and Krystal enter the Target, examine a Kodak printer bundle, consisting of a camera and printer dock, priced at $249.99, and put two of them in a cart. Elizabeth Espirit entered after Cindy and Krystal, but ultimately they abandoned the effort and went to another Target store.FN6

 FN6. The trio were also captured on video at the second Target store, and the State published to the jury two DVDs depicting Cindy, Krystal Jahanian, and Elizabeth Espirit at this store as part of its

examination of Osterberg concerning the theft ring's method of operation.

After leaving the second Target store, the trio then went to a Wal-Mart in Brenham, where they were again captured on video. The video showed Cindy and Krystal going down an aisle where phones were sold, but they left without buying anything. Elizabeth Espirit separately entered the store, went to the same aisle, and picked up two boxes of Panasonic cell phones along with some children's socks. She then went to a self-checkout aisle and attempted to scan the items, but when a cashier came over to assist her, the cashier saw that the phones were ringing up as $27.97. The cashier peeled off the UPC codes, and the phones rang up as $154.96. Espirit made an excuse and left the store without purchasing anything.

Boucher testified that the surveillance continued as the trio next went to a nearby Lowe's store. There, after Cindy and Krystal went to an aisle containing water filters, Espirit later went to the same aisle, picked up four Brita water filters, and purchased them for $6.96 apiece, when their actual price was around $32 apiece. The trio then continued on to a Home Depot in Brenham. As before, they were captured on video, and Boucher described their activities. At the Home Depot, Cindy and Krystal went down an aisle where faucets were located, and Espirit entered the store separately and went to the same aisle, picked up two faucets, and checked out. The faucets rang up as water filters for $26.97 apiece. Boucher testified that the faucets were actually priced at $208. On cross-examination, Boucher admitted that the total amount of loss from the stores where merchandise was purchased, after subtracting what was paid, came to roughly $600. He also admitted that he did not see Cindy or Krystal switching the UPC codes, nor did he see them walk out of the stores with any merchandise. He also never came in contact with Nicholas Jahanian.

Pat Smith, also an investigator with the Harris County District Attorney's Office, rode with Boucher during the surveillance. He testified that, after Cindy, Krystal, and Espirit left the Brenham Home Depot, they went to a Wal-Mart and a Lowe's in Bryan. They left the Wal-Mart without any merchandise. At the Lowe's, however, he observed Cindy and Krystal go to the plumbing aisle where they were "handling and looking at" Delta brand faucets. He saw Krystal return a box to the shelf as Cindy talked on a cell phone. They left the aisle, but then returned and handled the boxes again, as Krystal talked on a cell phone. He then saw Espirit, who was talking on her cell phone, go directly to the same area, where she picked up the same boxes, put them in her basket, and purchased them. After the trio left the store, Smith spoke with the cashier and determined that they had purchased two Delta faucets retailing for $208 apiece for approximately $27 apiece. The tape register from the transaction reflected that Espirit purchased water filters, but Smith testified that was not was he saw

her purchase, and a still photograph taken from video of the purchase also showed that she was buying a Delta faucet.

Smith also testified that, as a part of the investigation, he used his own eBay account to purchase a Delta faucet from Bwatchers. Emails confirmed that the purchase was shipped from "baywatch" at Cindy's Spanish Needle address, and that Smith paid "nickjahanian@hotmail.com" $157.50 for the "new in box" faucet. The return address on the packaging in which he received the faucet also reflected Cindy's Spanish Needle address. On cross-examination, Smith admitted there was no way to determine where the faucet he bought from Bwatchers came from. He also testified that there was no way for retailers to trace an item purchased on eBay back to a particular store.

Valerie Baker, Nicholas Jahanian's former girlfriend, testified that Nicholas eventually revealed to her the theft ring's operation after the relationship grew more serious. Among other things, Baker testified that they often chose Wal-Mart and Target stores because they had young cashiers who did not know the price of electronics. The types of items she saw Cindy and Krystal deliver to Nicholas included shavers, paintball guns, faucets, phones, cameras, and other electronics. Baker testified that she helped Nicholas steal by assisting him in packaging the stolen items to be sent to purchasers. On cross-examination, Baker admitted that she never saw Nicholas, Cindy, or Krystal steal anything, and all her information concerning the theft ring's operation came from Nicholas only. She also admitted that she and Nicholas sold some legitimate items on eBay and that they had joined a wholesalers club. She further admitted that she could not deny that Cindy or Krystal may have obtained items from places like flea markets or pawn shops to sell on eBay.

Dee Williams, a loss-prevention manager at Target, also participated in the surveillance of Cindy, Krystal, and Espirit on January 26, 2006. She testified about details of the ring's operation from her observations and the videos. She also testified that, while visiting a Pasadena Target, she learned that two days earlier, on January 24, Cindy, Krystal, and Espirit attempted to carry out their operation at that store. Store video showed Cindy and Krystal entering the store, and Espirit entering shortly thereafter. Cindy and Krystal removed Kodak bundle packs from a shelf and went to the back of the store. Several minutes later, they returned the merchandise to the shelf. Espirit then picked up two Kodak bundle packs from the shelf and attempted to check out with them. The items, which were priced at $249.99 apiece, rang up as Lexmark printer cartridges for $27.99 apiece. The cashier saw that the items were not ringing up at the correct price and informed the loss-prevention team. She also peeled off the UPC codes and re-scanned the items at their correct price. Espirit did not purchase the items.

Williams further testified that the Jahanians' operation enabled them to actually pay as little as $6 for each stolen item, and that they could even make money on the purchases aside from just the sales on eBay. She explained that they would purchase a Lexmark printer cartridge costing $27 for $6 by switching the correct UPC code with the UPC code for a $6 water filter. Once the printer cartridge was obtained, the Jahanians would have a UPC code for that item to use to purchase the more expensive items like cameras, high-dollar phones, and shavers for $27 each. When they purchased a more expensive item for $27, they received a receipt showing the purchase of a Lexmark printer cartridge for $27. They would then use that receipt to return the printer cartridge (for which they actually paid $6) and obtain a refund of $27 (for a net profit of $21). Thus, Williams testified, the ring could actually make money on the Lexmark printer cartridge purchase. And, by employing this scheme, it cost the Jahanians $6 to steal a high-dollar item like a shaver, phone, or camera.

Williams also testified that the ring had made such a transaction at the Pasadena Target. She explained that video from that Target showed that a little less than an hour before Espirit attempted to purchase the Kodak printer bundles, Cindy was shown returning two Lexmark printer cartridges in exchange for cash totaling $57.50. From the original receipt, Williams was able to determine that the purchase was made on January 19, 2006, five days earlier, at a Target in San Antonio. Photographs from that store showed Espirit buying two shavers, priced at between $150 and $250, that rang up as Lexmark printer cartridges. That purchase generated the receipt Cindy used to return Lexmark printer cartridges in exchange for cash. Thus, Williams testified, the ring was able to purchase about $400 worth of merchandise for about $50, and then obtain a refund of about $50 from a $6 purchase. Williams further testified that she was able to identify numerous similar transactions at Target stores in other locations ....

On cross-examination, Williams testified that the overall loss figure for the transactions she observed and was able to document was approximately $2,500. On redirect, however, she explained that this amount was based on her investigation of a roughly thirty-day period in a limited geographical area.

The State's next witness was Elizabeth Espirit. She testified that she had served jail time for engaging in the theft ring involving Cindy, Krystal, and Nicholas. She explained that she became involved through her husband, who was in the Harris County jail with B.J. Jahanian. B.J. had given her husband Krystal's phone number so that Espirit could call her about some work. She testified that Cindy and Krystal would give her instructions, and they would go to Target, Lowe's, Wal-Mart, Home Depot, and Academy stores to carry out the

scheme. She also testified to the details of the theft ring's operation, and confirmed that the ring stole all of the kinds of items listed on the indictment. She testified that they typically went out once or twice a week to steal, and each time they would go to between four and seven stores. Usually they would get one or two expensive items, unless they were getting ink cartridges, in which case they would get several. Concerning refunds, Espirit testified that they would use receipts to get cash, but if they did not have a receipt, they would take a previously stolen item to one of the stores and get a gift card. She estimated that she personally stole about $160,000 worth of merchandise.

On cross-examination, Espirit admitted that she really did not know how much she had stolen. She also admitted that she had met Nicholas Jahanian only once, and testified that he never gave her any instructions and she never saw him handle any stolen merchandise. She also testified that, after she spent time in jail, she pleaded guilty and was sentenced to ten years' deferred-adjudication probation and ordered to pay $50,000 in restitution.

Richard Schroeder, another participant in the theft ring, testified that he stole with the Jahanians from 2004 until 2006, and that he had previously been arrested for stealing with them. Most of the time, he would go with Cindy and Krystal, or Krystal and her ex-husband, to stores in and around various Texas cities, including Austin, San Antonio, Dallas, Fort Worth, Arlington, and Houston. As an example, Schroeder testified that they would go to Dallas about once a month and spend three or four days there. Each day they would go to eight to ten stores. In Houston, they would go out three or four days a week, and he went with them for over a year. Schroeder also testified that he and Nicolas once went to a Wal-Mart where Nicholas changed the bar code on a flat-screen television and Schroeder was arrested when he attempted to check out with the item. Nicholas was not arrested because he had already left the store. On cross-examination, Schroeder admitted that Nicholas never gave him any instructions or bar codes, and never gave him any money.

Jeremy Roble, a fraud investigator at eBay, explained how the eBay online-auction process works, and confirmed that the market is worldwide for items sold on eBay. He also explained that to put something for sale on eBay, one must create an eBay username or account, and have an e-mail address. He testified that he responded to a subpoena for records in this case, and in searching for information, he found that Nicholas Jahanian first established an account with eBay in August 2003, under the username Nick Jahanian, and he provided the e-mail address of "NickJahanian@hotmail.com." In October 2004, the username changed from Nick Jahanian to Bwatchers and the e-mail address changed to "eBaywatchers@hotmail.com." Roble further testified that State's

Exhibit 2A listed all of the transactions involving the Bwatchers account, and that the total sales price for the listed items was $258,970.36. He further testified that the list would not include sales after the end of October 2005, when he responded to the subpoena, and so it would not include sales from November 2005 through February 2006.

Todd Quattlebaum, the president of EZ Bayer, Incorporated, testified that his company buys and sells inventory for businesses and individuals on eBay. He testified that in 2003, Nicholas Jahanian listed some Panasonic DVD recorders and other items for sale through the company. Quattlebaum testified that Nicholas told him he was getting the items from a wholesaler. Quattlebaum also testified that the items Nicholas brought were all factory-sealed. After subtracting the company's fees for its services, Quattlebaum's records reflected 141 transactions for Nicholas totaling $13,611.23. Quattlebaum also estimated that his records did not reflect an additional twenty or thirty transactions.

Marshall Poe, a loss-prevention manager for Home Depot, testified . . . that he participated in the surveillance on January 26, 2006, of Cindy and Krystal at the Home Depot. He identified numerous items from State's Exhibit 2A as the type of items sold by Home Depot. . . On cross-examination, Poe acknowledged that Home Depot did not sell some of the types of items on the list. He also could not attribute the loss of specific items to the Jahanians, and he did not know whether items on the list came from the Home Depot. Poe further testified that Home Depot did not have the technology to determine whether someone had been switching bar codes, and there was no way for them to check to see if they had video of the Jahanians conducting their activities in their stores. Poe also confirmed that Home Depot did not have the ability to track a serial number from a package to a particular store. He further testified that Home Depot employees purchased two items over the internet from Bwatchers, and the items were shipped from Cindy's Spanish Needle address.

Tim Scott, who worked in loss prevention at Lowe's . . . identified items on State's Exhibit 2A as the types of items Lowe's sells . ... On cross-examination, he acknowledged that there were items on the list that Lowe's did not sell, and other than the items he saw the Jahanians steal during his participation in the January 2006 surveillance, he could not tell whether the items on State's Exhibit 2A were Lowe's property. Scott also acknowledged that Lowe's did not have the technology to match a bill of lading for items at Lowe's to the items sold on eBay.

Thomas Brady Bailey similarly testified as Target's representative . . . Bailey, an investigator specializing in organized-crime investigations with Target, and who was then assigned to the United

States Secret Service Federal Task Force, was also involved in the surveillance of the Jahanians on January 26, 2006 . . . He also testified that Target did not have the technology to trace a specific item back to a particular Target store. Bailey identified the types of items listed on State's Exhibit 2A that were sold at Target.

At the prosecutor's request, Bailey had previously picked out some of the items from the list to compare what Nicholas Jahanian sold them for on eBay to the sales price at Target. He testified that the average difference was thirty percent. Accordingly, Bailey testified that, applying that percentage to all of the stores, the $258,970.36 figure shown on State's Exhibit 2A would have to be increased by approximately thirty percent to determine the approximate retail value of the property. On cross-examination, Brady identified items on State's Exhibit 2B that Target did not sell. He also confirmed that the percentage of loss numbers he was asked to calculate by the district attorney's office were estimates. ...

Mary Jo Meador, a representative of Wal-Mart . . . testified that Wal-Mart sold many of the types of items listed on State's Exhibit 2B . . . On cross-examination, she identified items on the list that Wal-Mart does not sell. She also admitted that she could not trace any of the items on the list back to Wal-Mart, and she acknowledged that some of the items were sold by numerous retailers. She also admitted that she was not able to document any loss resulting from the Jahanians' activities ....

Larry Boucher… was recalled to the stand, and he testified concerning the arrests of Cindy, Krystal, and Nicholas Jahanian and the execution of the related search warrants. He described how Cindy and Krystal were arrested at Cindy's house on Spanish Needle. In executing the search warrant, the officers found, among other things, a printer and fax machine, an envelope containing UPC codes, and the paper stock on which UPC codes would be printed. The codes matched those recovered during the surveillance of Cindy, Krystal, and Espirit. In Krystal's car, parked outside the house, they found more UPC codes in Krystal's purse, and in the passenger-door compartment they found more of the paper stock used to print UPC codes as well as two pairs of scissors. In the trunk, they found several Target bags and receipts from Target, Wal-Mart, and Lowe's for items purchased for use in the theft scheme.

Boucher also described what was found in a storage unit that was searched with Cindy's consent. There, the investigation team found nearly one hundred shopping bags. The largest number came from Target, and many of the bags had loose UPC codes stuck to them. There were also bags from Wal-Mart, Lowe's, Home Depot, and Academy, along with some crumpled UPC codes. The officers also found at the storage facility shipping boxes labeled with Nicholas Jahanian's name and address.

*Jahanian v. State,* No. 14-07-00700-CR at 1 -8, 2009 WL 1493002 at *1-*8 ((Tex.App.-Houston, 2009)(some footnotes omitted).   Based on this evidence, Jahanian was convicted of engaging in organized criminal activity to steal goods valued at more than $200,000 and sentenced to 50 years imprisonment.

The 14th Court of Appeals affirmed the conviction and sentence, *Jahanian v. State,*  No. 14-07-00700-CR, 2009 WL 1493002 (Tex.App.-Houston, 2009).   Jahanian filed a petition for discretionary review ("PDR"), but the Texas Court of Criminal Appeals ("TCCA") refused it on November 4, 2009.  *Jahanian v. State*, PDR No. 834-04 (Tex. Crim. App. 2009).

Jahanian filed an application for a state writ of habeas corpus.  The TCCA denied relief.  *Ex Parte Jahanian*, No. 76,392-03 (Tex. Crim. App. Sept. 12, 2012).  He filed this federal petition on January 14, 2013.

II.  The Applicable Legal Standards

This federal petition for habeas relief is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997).  Under the AEDPA federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Kitchens v. Johnson*, 190 F.3d 698, 700 (5th Cir. 1999).  For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this court may grant relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]."  *See Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001).  Under the "contrary to" clause, this court may afford habeas relief only

if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'"  *Dowthitt v. Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)).

The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."  *Williams*, 529 U.S. at 406.  "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions before us and (2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts."  *Hoover v. Johnson*, 193 F.3d 366, 368 (5th Cir. 1999).  A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence."  *Neal v. Puckett*, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd*, 286 F.3d 230 (5th Cir. 2002) (en banc), *cert. denied sub nom. Neal v. Epps*, 537 U.S. 1104 (2003).  The sole inquiry for a federal court under the 'unreasonable application' prong becomes "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'"  *Id.* (quoting *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997)); *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'").

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the

evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d)(2); *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001).  The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Jackson v. Anderson*, 112 F.3d 823, 824-25 (5th Cir. 1997), *cert. denied*, 522 U.S. 1119 (1998).

III.    Analysis

Jahanian's petition raises eight claims for relief, including subclaims.   These are addressed in turn.

A.    Due Process

Jahanian contends that he was denied due process by several alleged trial court errors.

1.    Failure To Quash The Indictment

In his first claim for relief, Jahanian contends that the indictment was insufficiently specific because it failed to identify the number of thefts Jahanian and his ring allegedly committed or tie most of the alleged thefts to specific stores.  While the indictment alleged thefts of goods valued at more than $200,000 over a two year span, the trial evidence only demonstrated one or more thefts on one day, in an amount less than $1,200.  He now contends that the trial court denied him due process by denying his motion to quash the indictment.  It appears that the only objection to the trial court's ruling came in a *pro se* motion filed by Jahanian.  *See* Supplemental Clerk's Record (Docket Entry 13-12) at 6-13.

Jahanian raised this issue in his state writ.   The state habeas court found the claim procedurally defaulted because Jahanian failed to object to the ruling in the trial court.  The state habeas court noted that Jahanian was represented by counsel and was not entitled to file *pro se* motions.  SH at 205-06 (Finding of Fact # 7).[1]  The state habeas court found that, because Jahanian

---

[1]    "SH" refers to the record of Jahanian's state habeas corpus proceeding.

did not properly raise this record claim in the trial court, it was procedurally barred under Texas law. *Id.*

The procedural default doctrine may bar federal review of a claim. "When a state court declines to hear a prisoner's federal claims because the prisoner failed to fulfill a state procedural requirement, federal habeas is generally barred if the state procedural rule is independent and adequate to support the judgment." *Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001). The Supreme Court has noted that

> [i]n all cases in which a state prisoner had defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "This doctrine ensures that federal courts give proper respect to state procedural rules." *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997) (citing *Coleman*, 501 U.S. at 750-51), *cert. denied*, 523 U.S. 1125 (1998); *see also Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (finding the cause and prejudice standard to be "grounded in concerns of comity and federalism").

There is no dispute that Jahanian raised this claim in his state habeas corpus application, and that the state habeas court found the claim procedurally defaulted. The Court of Criminal Appeals adopted the trial court's findings.

A procedural default bars federal habeas review unless the petitioner shows cause for the default, and actual prejudice flowing from the alleged constitutional violation, or a miscarriage of justice. *Sykes*, 433 U.S. at 87, 80. "Cause" for a procedural default requires a showing that some objective factor external to the defense impeded counsel's efforts to comply with the state procedural rule, or a showing of a prior determination of ineffective assistance of counsel. *Murray v. Carrier*,

477 U.S. 478, 488 (1986); *Amadeo v. Zant*, 486 U.S. 214, 222 (1988).   A "miscarriage of justice" means actual innocence.  *Sawyer v. Whitley*, 505 U.S. 333, 335 (1992).

Jahanian does not contend that he is actually innocent.  He points to nothing external to the defense that impeded counsel's efforts to comply with state procedural requirements.[2]  This claim is therefore procedurally defaulted.

    2.    Denial Of Motion For Directed Verdict

Jahanian contends that his attorney moved mid-trial for a directed verdict "for lack of legal sufficient evidence."  Petition at 7.  He does not direct the court to any specific place in the trial record where such motion was made, and Respondent asserts that he cannot find any such motion.  *See* Answer at 27-28.  It is unclear whether Jahanian intends this merely as a claim arising out of the alleged denial of a directed verdict, or as two claims -- one concerning the denial of the directed verdict, and a second one challenging the sufficiency of the evidence.  Therefore, both issues will be addressed.

        a.    Directed Verdict

Respondent argues that this claim is procedurally defaulted.  Because it does not appear that Jahanian ever presented this issue to a Texas state court, it is unexhausted.  AEDPA requires that a prisoner exhaust his available State remedies before raising a claim in a federal habeas petition.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(I) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

---

[2]    Jahanian's brief argues that ineffective assistance of appellate counsel is cause for this default. The state habeas court's decision is clear, however, that it was counsel's failure to raise the issue in the trial court, not on appeal, that constituted the default.

28 U.S.C. § 2254(b)(1).  As the Fifth Circuit explained in a pre-AEDPA case, "federal courts must respect the autonomy of state courts by requiring that petitioners advance in state court all grounds for relief, as well as factual allegations supporting those grounds.  "[A]bsent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief."  *Orman v. Cain*, 228 F.3d 616, 619-20 (5th Cir. 2000); *see* 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . .").  Because Petitioner did not present this claim to the Texas state courts, he has failed to properly exhaust the claim, and this Court may not consider it.  *Knox*, 884 F.2d at 852 n.7.

Ordinarily, a federal habeas petition that contains unexhausted claims is dismissed without prejudice, allowing the petitioner to return to the state forum to present his unexhausted claims.  *Rose v. Lundy*, 455 U.S. 509 (1982).  Such a result in this case, however, would be futile because Petitioner's unexhausted claims would be procedurally barred as an abuse of the writ under Texas law.  On habeas review, a federal court may not consider a state inmate's claim if the state court based its rejection of that claim on an independent and adequate state ground.  *Martin v. Maxey*, 98 F.3d 844, 847 (5th Cir. 1996).  A procedural bar for federal habeas review also occurs if the court to which a petitioner must present his claims to satisfy the exhaustion requirement would now find the unexhausted claims procedurally barred.  *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991).

Texas prohibits successive writs challenging the same conviction except in narrow circumstances.  Tex.CodeCrim.Proc.Ann. art. 11.071 § 5(a) (Vernon Supp. 2002).  The Texas Court of Criminal Appeals will not consider the merits or grant relief on a subsequent habeas application unless the application contains sufficient specific facts establishing the following:

> (1) the current claims have not been and could not have been presented previously in an original application or in a previously considered application because the factual or legal basis for the claim

> was unavailable on the date the applicant filed the previous application; or
>
> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt.

*Id.* The Texas Court of Criminal Appeals applies its abuse of the writ doctrine regularly and strictly. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995) (per curiam).

Petitioner does not claim that he could not have presented the claim in his direct appeal or his state habeas petition because the factual basis for the claim did not exist, or that he is actually innocent. Therefore, Petitioner's unexhausted claim does not fit within the exceptions to the successive writ statute and would be procedurally defaulted in the Texas courts. *Coleman*, 501 U.S. at 735 n.1.

b.    <u>Sufficiency of the Evidence</u>

In addressing a sufficiency of the evidence claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The sufficiency of evidence is a mixed question of law and fact. *See Gomez v. Acevedo*, 106 F.3d 192, 198 (7th Cir. 1997), *vacated on other grds.*, 522 U.S. 801 (1997). Therefore, as noted above, this Court may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]." *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001).

In addressing Jahanian's claim, the Texas Court of Appeals identified the correct legal standard. *See Jahanian v. State*, 2009 WL 1493002 at *8. The court acknowledged Jahanian's argument that the items recovered during the investigation could not be traced to any particular store

or any particular act of theft.  The court found, however, that circumstantial evidence is admissible,

can be sufficient to support a conviction, and was so in this case.

> Here, the State presented circumstantial evidence, accomplice testimony, and other evidence to establish that most, if not all, of the property shown on State's Exhibit 2A was stolen from the stores whose representatives are named in the indictment. The testimony from the store representatives established that each of the stores sold in varying degrees merchandise of the types alleged in the indictment that State's Exhibit 2A reflected was sold by Nicholas Jahanian on his eBay account. The accomplice testimony and other evidence, discussed above, showed that (1) the theft ring of which Nicholas was a part stole large quantities of the types of merchandise alleged in the indictment from the stores during the relevant time, and (2) Nicholas sold the merchandise stolen by the ring from those stores on eBay for the benefit of the theft ring's members. State's Exhibit 2A, the eBay business records pertaining to Nicholas Jahanian's only eBay account during the relevant time period, showed not only the vast quantity of merchandise of the types alleged in the indictment-over 2,000 items-but also the price at which he actually sold each of the items.

*Id.* at *10.   The court concluded:

> Under the facts and circumstances of this case, the jury could have rationally inferred that all of the types of merchandise shown on State's Exhibit 2A and that were alleged in the indictment and named in the court's charge had been stolen from those stores by the theft ring's members. And, viewed in a neutral light, the evidence is not so weak that the jury's verdict seems clearly wrong and manifestly unjust, nor is the contrary evidence so strong that the jury's verdict is against the great weight and preponderance of the evidence

*Id.* at *11.  The court's conclusion is well supported by the evidence, including surveillance video,

accomplice testimony, Jahanian's own incriminating statements, testimony by store representatives,

and eBay sales records, and the court's reasoning.  It is neither an unreasonable application of the

*Jackson* sufficiency standard, nor is it based on an unreasonable determination of the facts.  The

court's conclusion is therefore entitled to deference under the AEDPA, and Jahanian is not entitled to

relief on this claim.

3.      Jury Instructions

Jahanian next complains that he was denied due process when the trial court failed to instruct the jury on how to determine the value of the stolen property in accordance with Texas Penal Code § 31.08.  Errors in jury instructions do not state a claim for relief unless the error resulted in "prejudice of constitutional magnitude." *Sullivan v. Blackburn*, 804 F.2d 885, 887 (5th Cir. 1986).  The habeas petitioner must demonstrate that the error "had a substantial and injurious effect or influence on the determination of the jury's verdict." *Mayabb v. Johnson*, 168 F.3d 863, 868 (5th Cir. 1999).  In a habeas proceeding, the burden of demonstrating that an erroneous jury instruction violates the petitioner's due process rights is "greater than the showing required to establish plain error on direct appeal." *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

The state habeas court rejected this claim finding, without much explanation, that the jury charge was proper.  While this issue was not addressed in Jahanian's direct appeal, it was addressed by the Court of Appeals in its decision on the appeal by Petitioner's co-defendant Cindy Jahanian.  In addressing Cindy Jahanian's identical claim, the Court of Appeals stated:

> The value of property in theft prosecutions is (1) the fair market value of the property at the time and place of the offense, or (2) if the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the theft. *See* Tex. Penal Code Ann. § 31.08(a) (Vernon 2003). Section 31.08 also provides that if a defendant proves by a preponderance of the evidence that he gave consideration for or had a legal interest in the property or service stolen, "the amount of the consideration or the value of the interest so proven shall be deducted from the value of the property or service ascertained ... to determine value for purposes of this chapter." *Id.* § 31.08(d) (Vernon 2003).
>
> * * *
>
> Here, the Jahanians were charged with and convicted of the offense of organized criminal activity under chapter 71, with the underlying offense being theft. *See* Tex. Penal Code Ann. § 71.02(a)(1) ("A person commits an offense [of engaging in organized criminal activity] if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, he commits or conspires to commit ... theft."). Consistent with Penal Code section 31.03, the trial court's charge

instructed the jury on the elements of theft. And, consistent with Penal Code section 31.09, the jury also was instructed as follows: "When amounts are obtained by theft pursuant to one scheme or continuing course of conduct, whether from the same or several sources, the conduct may be considered as one offense, and the amounts so taken aggregated to determine the grade and of the offense and the value of property taken. . .."

[While] a section 31.08 definition of value may be appropriate in this situation, we must still determine whether, as Cindy argues, the trial court erred in failing to *sua sponte* include it in the jury charge. Subsection 31.08(a) generally states that the value of property for the purpose of an offense under chapter 31 is "the fair market value of the property ... at the time and place of the offense," except for situations when fair market value cannot be shown, and in that case replacement value is applied. Although "fair market value" is not statutorily defined, it has long been stated to mean the amount of money that the property would sell for in cash, giving a reasonable time for selling it. *Keeton v. State*, 803 S.W.2d 304, 305 (Tex.Crim.App.1991). Fair market value may be proved by evidence of retail price, sales price, testimony of an owner's opinion of value, or expert opinion of value, but no single method for proving fair market value has been held to be conclusive. *Id.* As the Court of Criminal Appeals has recognized, "[u]se of various methods to show fair market value is certainly due to the necessity for flexibility because of the various circumstances of theft that arise ." *Id.*

Here, the only dispute regarding value related to the identity of the property shown on State's Exhibit 2A as property stolen from the stores, as discussed above. No evidence presented suggested that the fair market value of the stolen items could not be proven or that replacement value was an appropriate alternative, and there was no dispute concerning whether the State's evidence showing the value of the items demonstrated their fair market value. The State relied on its Exhibit 2A as evidence of the value of the stolen items, and investigator Osterberg testified that the value of the property appropriated from the stores was over $200,000 based on Nicholas Jahanian's sales on eBay. The investigating officers and store representatives also testified about the retail price of some of the items stolen, particularly when describing the events depicted on the surveillance videos, and Brady Bailey, an investigator for Target, testified that, on average, Nicholas Jahanian sold the type of items Target sold for about thirty percent less than the retail price of the items.

Although Cindy complains that the jury was left to speculate as to whether to use the retail store price or the eBay sale price to determine value, either method of determining value would have been valid. *See Keeton*, 803 S.W.2d at 305 (recognizing that methods of

proving value must be flexible because of the various circumstances of theft that arise). Moreover, the State's reliance on Nicholas Jahanian's eBay sales actually benefitted the defendants because the State presented some evidence that the retail value of the items was greater than the amount Nicholas Jahanian received from his sales on eBay and reflected on State's Exhibit 2A. Under these circumstances, the addition to the charge of a definition of value as "fair market value" would have been unnecessary and would not have assisted the jury, because nothing in the record suggests that the proof the State relied on to show value showed anything other than fair market value as that term is both defined under the common law and is commonly understood. Therefore, the trial court could not have erred by failing to *sua sponte* include section 31 .08's definition of "value" in the charge.

\* \* \*

Finally, Cindy also appears to complain that the trial court erred in failing to include subsection 31.08(d)'s provision for offset for consideration, because its omission left the jury to speculate as to whether she was "entitled to a deduction for monies paid as consideration to purchase the items under bogus UPC codes." Subsection 31.08(d) specifically provides:

> If the actor proves by a preponderance of the evidence that he gave consideration for or had a legal interest in the property or service stolen, the amount of the consideration or the value of the interest so proven shall be deducted from the value of the property or service ascertained under Subsection (a), (b), or (c) to determine value for purposes of this chapter.

TEX. PENAL CODE ANN. § 31.08(d). Cindy contends that, contrary to subsection 31.08(d), the prosecutor erroneously argued to the jury that the defendants were not entitled to a deduction for consideration paid for the stolen items, when "it was undisputed that the modus operandi of the theft ring was to actually give consideration for and purchase all items allegedly stolen, albeit for a lesser price than advertised by the respective stores." Thus, Cindy concludes, the absence of a value instruction in the charge prevented the jury from properly assessing the value of the stolen property.

When evidence from any source raises a defensive issue, and the defendant properly requests a jury charge on that issue, the trial court must submit the issue to the jury. *Muniz v. State*, 851 S.W.2d 238, 254 (Tex.Crim.App.1993). But, there is no duty imposed on a trial

court to instruct the jury on unrequested defensive issues, even though the issues are raised by the evidence. *See Bennett v. State*, 235 S.W.3d 241, 243 (Tex.Crim.App.2007); *Posey v. State*, 966 S.W.2d 57, 62-63 (Tex.Crim.App.1998). At least one court has held that consideration in a theft case is a defensive issue and the trial court did not err by omitting an instruction based on section 31.08(d) when the defendant fails to properly request it. *See Oglesby v. State*, 01-08-00158-CR, 2009 WL 144989, at *4-5 (Tex.App.-Houston [1st Dist.] 2009, no pet.). We agree that an instruction under section 31.08 is in essence one pertaining to a defensive issue, and therefore, in the absence of a request or an objection, the trial court did not err in failing to *sua sponte* include such an instruction in the charge *See Bennett*, 235 S.W.3d at 243, *Posey*, 966 S.W.2d 62-63; *Oglesby*, 2009 WL 144989, at *4-5.

Even if we assume the requested instruction is not defensive in nature, we conclude that the trial court did not err in failing to include it in the charge because Cindy was not entitled to such an instruction. As noted above, for Penal Code subsection 31.08(d) to apply, Cindy must first "prove[ ] by a preponderance of the evidence that [s]he gave consideration for or had a legal interest in the property or service stolen." *See* TEX. PENAL CODE ANN. § 31.08(d). Cindy's entire argument on this portion of her issue is the following: "The record reflects that every individual theft involved consideration paid at the check out counter. Appellant clearly established by a preponderance of the evidence that consideration was given for all stolen property." But the record shows that Cindy and the other defendants immediately rested after the State did, offering no evidence of their own. Cindy does not point out where in the record she offered proof of either any total dollar amount of consideration that she or any other member of the theft ring paid for the stolen merchandise, or any means, formula, or reasonable basis by which such an amount could be calculated.

Moreover, the evidence presented is contrary to Cindy's representation. The record reflects that the theft ring purchased or stole lower-priced merchandise, often items that would ring up as roughly either about $7 or $27, to obtain or to forge bar-code labels to put on the higher-priced merchandise they desired. At the stores, they switched the UPC codes on the higher-priced merchandise with the UPC codes for the lower-priced merchandise previously obtained, so that they could purchase the higher-priced items for the price of the lower-priced goods. The State's evidence also showed that the theft ring would return the lower-priced merchandise for a refund of some kind. For example, the ring would obtain a cash refund in situations in which there was a receipt, and when there was no receipt, the ring would obtain a gift card. As Dee Williams testified, the cost to the Jahanians to steal the higher-priced items was $6, and in some instances the theft ring was actually able to make a profit on returned

items. State's Exhibit 2A also reflects that a number of gift cards were sold on Nicholas Jahanian's eBay account, providing an additional source of profit to the ring. Consequently, even though members of the theft ring paid the price rung up for the lower-priced merchandise at the time they obtained the higher-priced merchandise from the stores, the evidence showed that at least some, if not most, of the higher-priced merchandise cost them little or nothing. Because Cindy directs us to no evidence that she proved by a preponderance that she gave actual consideration to the stores for the higher-priced merchandise, she cannot demonstrate that she was entitled to an instruction based on subsection 31.08(d). *See Bogia v. State*, No. 01-02-00950-CR, 2004 WL 253263, at *3-4 (Tex.App.-Houston [1st Dist] 2004, pet. ref'd) (mem. op., not designated for publication) (holding trial court did not err in denying requested instruction under Penal Code section 31.08(d) when appellant failed to prove by a preponderance of the evidence any value conferred upon complainant).

*Jahanian v. State, No.*   14-07-00703-CR at 15 -19, 2009 WL 1493007 at *15-*19 (Tex.App.-Houston [14 Dist.],2009) (footnote omitted).

The same analysis applies to Petitioner's claim.  The court concluded that the Jahanians were not entitled to a *sua sponte* instruction on valuation as a matter of Texas state law.  The conclusion that the value of the goods exceeded $200,000 is supported by evidence, specifically the value of Petitioner's eBay sales, and testimony that the retail value of the goods was approximately 30% higher than the eBay price.  Petitioner fails to demonstrate that the lack of a specific instruction on valuation rendered his trial fundamentally unfair or, indeed, prejudiced him in any way.  He therefore fails to demonstrate a due process violation, and is not entitled to relief on this claim.

B.    Ineffective Assistance of Counsel

In his remaining claims for relief, Jahanian contends that he received ineffective assistance of counsel.  To prevail on a claim for ineffective assistance of counsel, Petitioner

must show that . . . counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In order to prevail on the first prong of the *Strickland* test, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness.  *Id.* at 687-88.  Reasonableness is measured against prevailing professional norms, and must be viewed under the totality of the circumstances.  *Id.* at 688.  Review of counsel's performance is deferential.  *Id.* at 689.

As to those claims the Texas state courts have already decided against him, Jahanian faces a very high burden in this federal habeas corpus proceeding.

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.,* at 689 [104 S.Ct. 2052]; *Lindh v. Murphy,* 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*]*,* 556 U.S., at ----, 129 S.Ct. [1411], at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at **----,** 129 S.Ct., at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland* 's deferential standard.

*Premo v. Moore*, U.S. 131 S.Ct. 733, 740 (2011).

1.    <u>Motion to Quash</u>

Jahanian first contends that his counsel was ineffective by failing to file a motion to quash the indictment or obtain a ruling on a motion to quash filed by Cindy Jahanian.  As discussed above, Jahanian contends that the indictment was insufficiently specific as to whether specific pieces of property were stolen, and from who they were stolen.

In connection with Jahanian's state habeas corpus proceeding, counsel submitted an affidavit noting that the indictment identified specific types of merchandise it alleged was stolen, and that counsel concluded, based on his legal research, that a motion to quash was not supported by the law and would have been unsuccessful.  He also had a trial strategy to argue that the State failed to

connect specific merchandise to specific retailers.  A more specific amended indictment would have undermined that strategy.  SH at 200.

Texas law provides that "a motion to quash will be allowed if facts sought are essential to give notice, and unless the fact is essential, the indictment need not plead evidence relied on by the state." *State v. Rivera*, 42 S.W. 3d 323, 329 (Tex.App.–El Paso 2001).  It thus appears that counsel's analysis was correct and that a motion would have been futile under Texas law.  Counsel is not required to make futile motions.  *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990).

The state habeas court found that the affidavit was credible, and that the decision not to move to quash the indictment was the result of reasonable trial strategy.  This decision is not unreasonable on the facts or the controlling law.  Jahanian is not entitled to relief on this claim.

2.      Admission of eBay Spreadsheet

Jahanian next claims that counsel was ineffective by failing to object to the admission of a spreadsheet showing eBay sales receipts.  Jahanian, however, fails to demonstrate any grounds on which the spreadsheet was inadmissible, and the state habeas court noted that the evidence was admissible.  SH at 207 (Finding # 14).  Counsels' failure to raise a meritless claim did not constitute deficient performance.  *See, e.g.*, *Sones v. Hargett*, 61 F.3d 410, 415 n.5 (5th Cir. 1995) ("Counsel cannot be deficient for failing to press a frivolous point").

3.      Co-Defendant's Testimony

Jahanian next contends that counsel was ineffective by failing to object to the testimony of his co-defendant Elizabeth Espirit.  While Jahanian characterizes Esprit's testimony as "uncorroborated," counsel noted that her testimony was corroborated by surveillance video of Esprit committing thefts with other co-defendants, thus linking her to the conspiracy.  The state habeas court found that counsel's cross-examination established that Esprit met petitioner on only one occasion, he never directed her to do anything, and she never saw him handle any stolen property, or testified that she knew of any illegal activity by petitioner.  SH at 202.

Jahanian cites no law or legal basis for excluding Esprit's testimony. In any event, the record shows that she provided no evidence linking Jahanian to any illegal activity. 5 Tr. at 198-99.[3] Therefore, even if counsel could have objected to her testimony, Jahanian fails to demonstrate any prejudice caused by counsel's failure to do so.

> 4.    Jury Charge

In his final claim for relief, Jahanian contends that counsel was ineffective by failing to object to the jury charge to obtain a charge that clarified how the jury should value the alleged thefts. Respondent argues that this claim is unexhausted and procedurally defaulted. However, as discussed above, the Court of Appeals, in the case of Cindy Jahanian, found that the jury charge was not objectionable. Therefore, even if this claim is not defaulted, it is without merit.

## IV.   Conclusion

For the foregoing reasons, Jahanian fails to raise a viable claim for habeas relief. His petition must be dismissed with prejudice for the reasons stated in this opinion.

## V.   Certificate of Appealability

Jahanian has not requested a certificate of appealability ("COA"), but this Court may determine whether he is entitled to this relief in light of the foregoing rulings. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny COA *sua sponte*. The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.") A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request. *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of

---

[3]    "Tr." refers to the trial transcript.

appeals does."). "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting appellate review to those issues alone." *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431 (5th Cir. 1998). A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir.), *cert. denied*, 531 U.S. 966 (2000). The Supreme Court has stated that:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where . . . the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000). However, "the determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000), *cert. dismissed*, 531 U.S. 1134 (2001).

This Court has carefully considered Jahanian's claims. The Court finds that the claims are foreclosed by clear, binding precedent. This Court concludes that under such precedents, Jahanian has failed to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. §

2253(c)(2). This Court concludes that Jahanian is not entitled to a certificate of appealability on his claims.

VI.     Order

       For the foregoing reasons, it is ORDERED as follows:

       A.      Petitioner Nicholas Paul Jahanian's Petition for Writ of Habeas Corpus (Doc. # 1) is

               in all respects DENIED; and

       B.      No certificate of appealability shall issue.

       The Clerk shall notify all parties and provide them with a true copy of this Memorandum and

Order.

       SIGNED on this 13th day of February, 2014.

                                               _____
                                               Kenneth M. Hoyt
                                               United States District Judge